MOEEL LAH FAKHOURY LLP
Shaffy Moeel (State Bar No. 238732)
1300 Clay Street, Suite 600
Oakland, CA 94612
Telephone: (510) 500-9994
Email: shaffy@mlf-llp.com

Attorneys for Eduardo Guzman Torres

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA, | Case No.: 19-CR-655-HSG |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| EDUARDO GUZMAN TORRES, | **Court:** Courtroom 2, 4th Floor |
| Defendant. | **Hearing Date:** April 13, 2022 |
| | **Hearing Time:** 10:00 a.m. |

# TABLE OF CONTENTS
# TABLE OF CONTENTS

table of contents...................................................................................................................................i

INTRODUCTION ...............................................................................................................................1

STATEMENT OF FACTS....................................................................................................................1

    A.    Mr. Guzman's History and Characteristics........................................................................1

    B.    Mr. Guzman's Future Goals and Plans ..............................................................................9

SENTENCING ARGUMENT .............................................................................................................10

    A.    Seriousness of the Offense, Respect for the Law and Just Punishment..........................10

    B.    Deterring Criminal Conduct and Protecting the Public. ..................................................13

    C.    The Guidelines Sentencing Range. ..................................................................................13

CONCLUSION ....................................................................................................................................13

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38, 52 (2007) ................................................................. 10, 11

*Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008) ................................................................. 10

*Tapia v. United States*, 564 U.S. 319, 326 (2011) ................................................................. 10

*United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985) .............................................. 10

*United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) .................................... 10

*Williams v. New York*, 337 U.S. 241, 247 (1949) ................................................................. 10

**Statutes**

18 U.S.C. § 3553 ................................................................................................................. 10, 13

**Other Authorities**

Audra Burch, "A Gun to His Head as a Child. In Prison as an Adult." *New York Times*, Oct. 15, 2017, https://www.nytimes.com/2017/10/15/us/childhood-trauma-prison-addiction.html .................. 11

National Commission on COVID-19 and Criminal Justice, "COVID-19 in U.S. State and Federal Prisons, December 2020 Update," at 3, *available at* https://cdn.ymaws.com/counciloncj.org/resource/resmgr/covid_commission/COVID-19_in_State_and_Federa.pdf ....................................................................................... 12

Rhitu Chatterjee, "CDC: Childhood Trauma is a Public Health Issue and We Can Do More to Prevent It," *National Public Radio*, Nov., 2019, https://www.npr.org/sections/health-shots/2019/11/05/776550377/cdc-childhood-trauma-is-a-public-health-issue-and-we-can-do-more-prevent-it ....................................................................................... 11

Invernizzi A, Williams J, editors. *In: The Human Rights of Children: From Visions to Implementation.* 1st ed. London, UK: Ashgate Publishing Ltd; 2013. Understanding a human rights based approach; pp. 61–98……………………………………………………………………...…………3

Haney, Craig. (2020) Criminality in Context: The Psychological Foundations of Criminal Justice Reform, p.186……………………………………………………………………………3, 9

Reardon, S.F. (2013), May. The widening income achievement gap. *Educational Leadership*, 70, 10-16……………………………………………………………………………………………..4

**Rules**

USSG § 2D1.1(a)(2) ........................................................................................................................ 13

# INTRODUCTION

Life has been difficult for Fortino Guzman Jimenez, the true name of the person charged as Eduardo Guzman Torres. His first memories are of being hungry and afraid. Nearly every person in his life who was meant to love and protect him, failed him. For the vast majority of his still-young life, he has lived in utter destitution as among the poorest members of our global society. And yet, despite all of that, he has worked hard to seek security, to provide for his loved ones, and to become a kind and nurturing adult.

Mr. Guzman is tremendously remorseful for the suffering he has caused. He humbly asks this Court to sentence him to 78 months in the custody of the Bureau of Prisons ("BOP").

# STATEMENT OF FACTS

**A.    Mr. Guzman's History and Characteristics.**

   **i.    Fortino's Early Life**

Fortino Guzman Jimenez (Fortino) was born in Michoacán, Mexico, on November 22, 1987, to Consuelo Guzman Jimenez (Consuelo) and Antioco Merced (Antioco). Fortino has five siblings, all residing in Mexico: Antonio (age 40), Carlos (age 39), Leonardo (age 33), Felipa (age 36), and Alejandro (age 21). Leonardo is Fortino's only full sibling, all other siblings have different fathers.

Fortino and his siblings were raised by his maternal grandmother, Enresdina Jimenez (Enresdina), an emotionally distant caretaker who withheld affection from the children. Fortino's mother, Consuelo, was essentially absent in his life and seldom visited him or his siblings. For most of the year she remained in the brothel bar where she worked as a prostitute and rented a room to live and conduct business in. On the few occasions Consuelo visited, she only stayed for the night and slept in the vehicle she arrived in. During these "visits," she arrived drunk and usually with a man by her side. When she wasn't drinking or passed out, she was cruel towards Fortino, yelling obscenities at him and hitting him for minor infractions. Rather than finding love and comfort in his mother, Fortino received hostility and abuse. Rejection was Fortino's experience when it came to his father who was never a

part of his life. The only time Fortino was in the same room as his father was once, when Fortino stopped by his paternal uncle's furniture shop to ask for a glass of water. His uncle, who occasionally gave Fortino spare change when he saw him, revealed that Fortino's father was also inside the shop on that day, and alerted Antioco of Fortino's presence. In reply, Fortino heard his father call out that he was too busy to meet him. A response that triggered tears from Fortino and his uncle's embrace.

  **ii. Circumstances of Fortino's Home Life**

Fortino was raised in abject poverty, his home consisted of a one room dwelling made of cardboard and scraps of wood where water seeped, and scorpions crawled through. Cooking was done outside, atop a makeshift firewood stove and there was no electricity or plumbing, forcing Fortino and his family to urinate and defecate in the surrounding area nearby. Unable to afford toilet paper, they used rocks and tree leaves to wipe themselves as clean as these objects permitted. During the rainy season, his family's meager possessions became soaked, and their dirt floors muddied. Under these conditions Fortino attended school barefoot, unable to trek the 40-minute slippery and muddy route to school in flipflops, the only pair of shoes he owned.

For food the family relied on the weekly packages Fortino's mother sent, which were not enough to subsist on, making eating to the point of fullness nonexistent for Fortino. What little food they had, Fortino's grandmother rationed throughout the week, but on most days Fortino's meals consisted of a cup of boiled lemon and guava leaves for breakfast, no lunch, and a tortilla with chile and tomatoes for dinner. With so many children, fights over scraps of food regularly erupted among the siblings. When the supply of tortillas was consumed, Fortino's grandmother pleaded with neighbors for leftover pig food scraps which she then toasted in the sun with chile. At the age of ten, Fortino began collecting wood to earn money for food. According to *The Human Rights of Children: From Visions to Implementation*, Child labor is rooted in poverty, income insecurity, social injustice, lack of

public services, and lack of political will,[1] all which Fortino was subjected to throughout his childhood and adolescence.

Fortino's impoverished childhood exposed him to daily unsanitary and dangerous conditions harmful to his health. Including being stung approximately thirty times by scorpions who crept in through the cracks in his house, each time foregoing medical care because his grandmother was unable to afford it. Instead, she relied on home remedies in which she placed bleach on his wounds, bandaged them, and gave him garlic to eat and wine to drink. On several occasions Fortino suffered severe reactions to the scorpion stings wherein he became unresponsive and experienced muscle thrashing, numbness, drooling, and difficulty breathing that caused him to turn purple. The most severe stings required an injection provided by a community member who he was forced to pay using the earnings he made collecting and chopping wood.

### iii. Fortino's Introduction to Substance Abuse

By the time Fortino was 12 years old he was smoking marijuana, snorting cocaine, and drinking alcohol (his first drink provided by an older male relative who gave him cow's milk and alcohol) to self-medicate. Unfortunately, Fortino's method of escape is all too common among victims of trauma who turn to drugs and alcohol to reduce pain. "Because harmful past experiences can shape present decision-making, the victims of early trauma and risk factors often develop patterns and styles of coping with difficult situations that are themselves problematic and self-fulfilling in nature."[2] Fortino's alcohol use began during his early adolescence and has continued throughout his adult life causing numerous issues for him physically, psychologically, and emotionally.

Fortino's poverty was so acute it made him a target of ridicule among his peers. Unable to hide

---

[1] Invernizzi A, Williams J, editors. *In: The Human Rights of Children: From Visions to Implementation.* 1st ed. London, UK: Ashgate Publishing Ltd; 2013. Understanding a human rights based approach; pp. 61–98.
[2] Haney, Craig. (2020) Criminality in Context: The Psychological Foundations of Criminal Justice Reform, p.186.

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Guzman,* 19-CR-655-HSG

3

his bare feet or the plastic bag that he used as a backpack, Fortino was often the subject of ridicule among his classmates who shamed him for both being poor and having a mother whom they had witnessed prostitute herself in vehicles. This taunting often escalated to rock throwing resulting in physical scars Fortino still bears today. As *The Widening Achievement Gap* found, the educational disadvantages that poor children endure often interferes with their ability to connect to the positive influence of the social school environment, weakens the potential protective factor of school success, and decreases employment options in the future.[3] This is the case for Fortino who only experienced additional trauma from students and teachers and eventually dropped out of school, limiting his future opportunities in the workforce.

### iv. Falling Behind in School

Along with enduring the torment of his peers, Fortino struggled academically. From the start of his education, Fortino found it difficult to concentrate and grasp basic concepts and was regularly subjected to corporal punishment by teachers who believed hitting him would yield correct answers and understanding but instead further traumatized him. Fortino repeated both the third and fifth grade twice, and ultimately abandoned school at the age of 15, illiterate and several grades below his peers. Fortino's inability to focus or understand the material presented to him in school likely stemmed from his impoverished environment and circumstances which compromised all aspects of his growth and development. As research has found, "Poverty is tied to structural differences in several areas of the brain associated with school readiness skills, with the largest influence observed among children from the poorest households."[4] Further, "specific brain structures tied to processes critical for learning and educational functioning (eg, sustained attention, planning, and cognitive flexibility) are vulnerable to

---

[3] Reardon, S.F. (2013), May). The widening income achievement gap. *Educational Leadership*, 70, 10-16.
[4] Hair, N.L., J.L. Hanson, B.L. Wolfe and S.D. Pollak, 2015. Association of child poverty, brain development and academic achievement. JAMA Pediatrics, 169(9): 822-829. V

the environmental circumstances of poverty, such as stress, limited stimulation, and nutrition."[5] Fortino's academic deficits were prevalent throughout his educational history and have persisted through adulthood so much so he did not learn to read until age 21.

### v. Entering the Laboring Force and Migrating North

After leaving school, Fortino worked chopping wood and watering crops for a year, earning 50 Mexican pesos a day (currently 2.33 U.S. dollars) most of which he gave to his grandmother for food. At age 16 years old Fortino immigrated to the United States with the help of a relative's friend who agreed to transport Fortino from Mexicali, Mexico, to the U.S. border for a fee Fortino agreed to pay once he obtained employment. From Michoacán, Fortino traveled by bus to Mexicali eating sandwiches and barely sleeping throughout the long journey fearful of being victimized while asleep. By the time he arrived in Mexicali he was fatigued and in need of reprieve. However, what he experienced was an unwelcoming household where he was only given eggs to eat, a floor to sleep on, and forced to remain outside in the backyard until the evening hours for a week. This treatment felt especially cruel as he observed the residents eat plentiful and sleep comfortably. Eventually, Fortino was driven near the U.S. Mexico border wall which he climbed up and then down using a rope. Once in United States territory he was subsequently picked up by a driver who transported him to the home of his aunt, Maria Nicolasa (Maria), who provided him with clothing and a room to rent in San Jose, California. Almost immediately he obtained employment in construction and worked tirelessly to pay off his immigration passage debt and to send money to his family in Mexico.

Fortino's new life in the United States felt like a "rebirth."[6] For the first time in his life he experienced what it was like to purchase food when he was hungry and had shoes to wear, "a miracle from God."[7] After being in the United States for approximately eight months, Fortino was apprehended

---

[5] Id.
[6] Fortino Guzman Jimenez Interview
[7] Id.

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Guzman,* 19-CR-655-HSG

5

and deported back to Mexico where he remained for a year. At 18 years old Fortino immigrated back to the United States and made his way to Santa Rosa, California, where he and his two brothers, Carlos and Antonio settled and obtained employment at an auto mechanic shop.

### vi.     Return to Mexico

Surrounded by his siblings Fortino began to drink heavily to cope with his depression, at times drinking approximately 24 beers a day. Like Fortino, Carlos and Antonio also used substances to numb their trauma. After five years, Carlos returned to Mexico for drug treatment, having become heavily addicted to heroin and methamphetamine which he remains dependent on today. Antonio was eventually deported back to Mexico because of a criminal charge.

At 21 years of age Fortino met Teresa Guzman (Teresa), who he later married and had two children and a stepdaughter with. Together he and Teresa lived in Santa Rosa where Fortino was employed as a grape picker and she as a restaurant worker. While Fortino describes the first seven years of their marriage as good, he looks back on the later years with regret because of the tension his alcoholism created. Despite Fortino's alcohol addiction he tried his best at being a good father. He dropped his children off and picked them up from school daily and cared for them until he left for work in the evenings. Never having enough clothing to wear or food to eat as a child, he ensured his children were well fed and well-dressed even when he was not. He also emphasized the importance of education and advocated for his son to receive additional educational assistance when he struggled with reading much the same way Fortino did as a child and as an adult. His stepdaughter, Jeovanna Itzel Alcala-Guzman (Jeovanna), described the bond she shared with Fortino and his dedication as a father, "He's a really good person. I never had my dad in my life but he was that for me. If I needed or wanted anything, clothes, toys, whatever, I could ask him and he was there. He always helped me out and made

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Guzman,* 19-CR-655-HSG

6

me feel like I wasn't alone. If he was my actual dad I'd say I have a really good dad."[8]

In 2011, Fortino was arrested for driving under the influence of alcohol and marijuana and deported to Mexico where his wife and children joined him and where they remained for four years. In Michoacán they grew and sold produce, a modest and often dangerous living that required them to sell in dangerous areas at all hours of the day and night.

While in Mexico, Fortino continued to struggle with alcohol abuse and underwent a vehicle accident while driving under the influence of alcohol that resulted in his car flipping over and hospitalization for head injuries. For four days Fortino lay unresponsive in the hospital before showing signs of improvement. Since the accident, Fortino has suffered persistent migraines and headaches that feel like "tumors"[9] which he "does not wish upon his enemies."[10]

In Mexico, Fortino witnessed and personally experienced the gruesome brutality of the cartels. He saw dead bodies and limbs protruding from black trash bags stacked along roadsides and described seeing a severed body placed on a chair with a large knife protruding from its torso.  Like many residents in the community, Fortino was targeted by drug cartel members who falsely accused him of purchasing marijuana to sell, a drug he only obtained for self-consumption. For this purported offense Fortino was abducted, whipped four times, wrapped in a plastic tarp, and thrown off the bed of a pickup truck where he sustained head and body injuries. In another close encounter, he witnessed the abduction of his wife's cousin, who was beaten and forced to drink gasoline close to the point of death before his almost lifeless body was dumped. An experience that granted Fortino's wife's asylum to the United States. A month after his wife obtained asylum, Fortino again immigrated to the United States to be

---

[8] Interview of Jeovanna Itzel Alcala-Guzman
[9] Fortino Guzman Jimenez Interview
[10] *Id.*

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Guzman,* 19-CR-655-HSG

7

with his family and resettled in Santa Rosa where he resumed work in the fields.

### vii. Returning North

With he and his wife's income along with the assistance of programs like WIC, Fortino was able to afford necessities for his family. However, when his grandmother Enresdina became ill with diabetes in conjunction with his mother who developed a heart condition, he surrendered to the economic pressure and allure of selling drugs to make easy money as persuaded and influenced by his brother, Carlos. With the additional money Fortino made selling drugs, he was able to send money to his grandmother and mother to afford their medications, surgeries, and hospital stays. Despite his grandmother's emotional detachment and the years of abuse that Fortino endured from his mother, his loyalty towards his family was resolute. Jeovanna observed Fortino's commitment to ensuring his family's well being despite their treatment of him, "even though his mom just wanted money and didn't care about him he's always done the most to help her out. That's just who he is."[11]

### viii. Mr. Guzman's Unrelenting Exposure to Trauma

Fortino has experienced several forms of trauma, many of which made him susceptible to a variety of issues including criminality. He was raised by an emotionally unavailable grandmother, abandoned, neglected, and abused by his mother, and never acknowledged by his father. He was a victim of extreme poverty which denied him access to medical care, likely contributed to his learning impairments, and exposed him to vile, unsanitary, and often hazardous living conditions, as well as subjected him to verbal and physical abuse at school. After years of enduring numerous forms of trauma, he began to use alcohol and drugs to cope with his reality which further exacerbated his condition. All factors which cannot be overlooked because of their profound impact on a human being

---

[11] Interview of Jeovanna Itzel Alcala-Guzman

much less a child during critical developmental years. "Several decades of psychological theory and research now document the basic proposition that events that occur in childhood and adolescence can profoundly influence and affect adult behavior. Psychologists have long known that children need to be provided with 'dependable attachment, protection, guidance, stimulation, nurturance, and ways of coping with adversity'[12] during their early years of growth and development. But we also know that many people who violate the law have lacked many of these things in their early lives and have been exposed instead to forms of psychological trauma…"[13] The multiple risk factors Fortino endured throughout his life contributed to the host of medical, psychological, and legal problems he faces today. Now as an adult he has diabetes, high cholesterol, recurring migraines and headaches, depression, and substance abuse issues. His relationship with his wife has been negatively impacted because of his alcoholism and arrest and he faces extended incarceration and deportation to the country where his trauma began. Unfortunately, Fortino's compound risk factors negatively impacted and compromised his development and most certainly contributed to his cognitions and criminal behavior. It is with this understanding in mind that it is respectfully recommended that the Court consider a lenient sentence for Fortino Guzman Jimenez that takes his mitigating social history into account.

**B.     Mr. Guzman's Future Goals and Plans**

Mr. Guzman accepts responsibility for the devastation his part in this case has caused.  He feels deeply regretful.  He does not want to spend any more time in custody.  Before this case, the longest he had ever been in custody was a 6 month sentence he received for a marijuana sales offense when he was 17 years old. PSR ¶ 65.  The sentence in this case is significant and lengthy. The future seems uncertain right now for Mr. Guzman but one thing is for sure---he has every incentive to live a law-

---

[12] Hamburg, d. A. (1993). The American family transformed. Society, 30, 60-69, http://dx.doi.org/10.1007/BF02695809
[13] Haney, Craig. (2020) Criminality in Context: The Psychological Foundations of Criminal Justice Reform, p. 87.

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Guzman,* 19-CR-655-HSG

9

abiding life in a safe place where he can work hard and provide for his loved ones.

## SENTENCING ARGUMENT

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended in the U.S. Sentencing Guidelines ("U.S.S.G.") is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

Mr. Guzman respectfully requests this Court sentence him to 6 years and 6 months in custody (78 months).

### A. Seriousness of the Offense, Respect for the Law and Just Punishment.

The Supreme Court has explained the factors in § 3553(a)(2)(A)—the seriousness of the offense," the need "to promote respect for the law" and "provide just punishment for the offense"—are the sentencing rationale of "retribution." *See Tapia v. United States*, 564 U.S. 319, 326 (2011) ("a court may not take account of retribution (the first purpose listed in 3553(a)(2)) when imposing a term of supervised release") (emphasis omitted). "The goal of retribution" is the "interest[] in seeing that the offender is repaid for the hurt he caused." *Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008). Yet, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without

taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).

A six-and-a-half year sentence is a significant prison sentence, particularly considering this sentence is exponentially higher than any custodial sentence that Mr. Guzman served in the past.

Moreover, such a serious and lengthy sentence also accounts for conduct and circumstances of this case and Mr. Guzman's history and characteristics, including his traumatic upbringing. Trauma during childhood creates higher risks for negative outcomes in life, including health and life opportunities.[14] Supportive and nurturing relationships and environments for children and families are at the "heart of prevention" for children with trauma history. *Id.* Mr. Guzman certainly did not have that kind of childhood. He was emotionally abused and neglected by his mother and grandmother, experienced hunger daily, and lived under extreme levels of poverty, he was exposed to a constant barrage of brutal acts of violence, lived in fear for his safety and the safety of his loved ones, and all of this continued well into adulthood.

Context matters. The context of Mr. Guzman's upbringing is, as told to the *New York Times*, "in a justice system built upon the idea of choice and personal responsibility, experts say the path to trouble may begin long before an individual has any say in the matter. What happens to people in childhood can make a difference in whether they end up in a prison cell, or whether they are even wired to make rational decisions."[15] It is often repeated by prosecutors that childhood trauma is not an excuse for an adult's behavior, dismissing years of neglect inflicted upon a helpless child because a grown woman has had plenty of time to decide what type of adult she should be. However,

---

[14] *See* Rhitu Chatterjee, "CDC: Childhood Trauma is a Public Health Issue and We Can Do More to Prevent It," *National Public Radio*, Nov., 2019, https://www.npr.org/sections/health-shots/2019/11/05/776550377/cdc-childhood-trauma-is-a-public-health-issue-and-we-can-do-more-prevent-it.

[15] *See* Audra Burch, "A Gun to His Head as a Child. In Prison as an Adult." *New York Times*, Oct. 15, 2017, https://www.nytimes.com/2017/10/15/us/childhood-trauma-prison-addiction.html.

childhood trauma does not have an expiration date. Indeed, as one Cornell University sociologist told the *New York Times,* trauma is a major factor "that shapes addictive and criminal behavior in adulthood" and is a "huge factor within the criminal justice system."[16] As a doctor with the Centers for Disease Control elaborated, "children's adverse experiences are a public health problem" as "childhood adversity and stress can chemically change the way our brains work."[17]

Thus, Mr. Guzman's childhood trauma shaped his adulthood and continues to impact him every day of his life. While Mr. Guzman accepts responsibility for the mistakes that he made and the devastation his conduct has caused, any sentence must take his childhood adversity and his own struggles with substances and alcohol into account.

A six-and-a-half year sentence is also justified by the fact that being in jail has been, and will continue to be, significantly more difficult due to the COVID-19 pandemic. COVID-19 has wreaked havoc in prisons and jails across the country including the San Francisco County jail, Santa Rita jail and the BOP. One study has found that the COVID-19 confirmed case rate in prison is 3.7 times higher than the national rate, and the death rate was two times the number expected given mortality among individuals of a similar age, gender, and race.[18] In an effort to control the spread of the disease, jails have held inmates under lockdown conditions like solitary confinement and restricted physical visits. Indeed, Mr. Guzman will have concluded this case only having seen the inside of a courtroom a handful of times.

Because COVID-19 has made the time Mr. Guzman has served—and will continue to serve—more severe than it would be otherwise (he contracted Covid twice while incarcerated at the Santa

---

[16] *Id.*

[17] *Id.*

[18] *See* National Commission on COVID-19 and Criminal Justice, "COVID-19 in U.S. State and Federal Prisons, December 2020 Update," at 3, *available at* https://cdn.ymaws.com/counciloncj.org/resource/resmgr/covid_commission/COVID-19_in_State_and_Federa.pdf.

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Guzman,* 19-CR-655-HSG

12

Rita Jail before he was able to obtain the vaccine and with the comorbidity of diabetes, his first bout with the illness was particularly devastating, painful and frightening), a lengthy six-and-a-half-year prison sentence is sufficient but not greater than necessary.

**B.      Deterring Criminal Conduct and Protecting the Public.**

A 78 month sentence will send Mr. Guzman the message that conduct such as that charged in the instant case will be treated seriously by this Court. Again, since Mr. Guzman has only ever served 6 months in custody before the instant case, the sentence he is facing here—78 months—is significant enough to deter him from any future illegal activity.

As for protecting the public, Mr. Guzman understand that he will likely be deported from the United States after serving his sentence.

**C.      The Guidelines Sentencing Range.**

The parties agreed to the following guideline calculations in Mr. Guzman's plea agreement:

| | | | |
|---|---|---|---|
| Base offense level: | 34 | USSG § 2D1.1(a)(5) | PSR ¶ 52 |
| Safety Valve: | -2 | USSG §5C1.2 | |
| Acceptance of Responsibility: | -3 | USSG §3E1.1 | |
| Resulting Offense Level: | 29 | | |

In a Criminal History Category of II (PSR ¶ 69), Mr. Guzman's guideline range before any variances is 97-121 months.

Mr. Guzman requests a variance pursuant to 18 U.S.C. § 3553 to 78 months, the equivalent of a low-end sentence of a 2-level departure from his advisory guideline range.

**CONCLUSION**

Mr. Guzman respectfully requests this Court sentence him to 6 and a half years (78 months) in custody to be followed by 3 years of supervised release.

April 8, 2022                                    Respectfully submitted,

                                                                               */s/ Shaffy Moeel*

                                                                               SHAFFY MOEEL
                                                                               MOEEL LAH FAKHOURY LLP
                                                                               Attorneys for Mr. Guzman